## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | 2:17-cr-00031 |
| | ) | |
| v. | ) | Chief Judge Mark R. Hornak |
| | ) | |
| ERIC CLANCY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Defendant Eric Clancy is currently serving a ninety-month Bureau of Prisons ("BOP") custodial sentence for various drug distribution and firearms possession charges. Mr. Clancy currently resides at the Butler County (PA) Prison ("BCP") on a U.S. Marshal's detainer as a result of his being temporarily transferred there pending his anticipated appearance at a court proceeding, and he is scheduled to be released from BOP custody on his sentence on December 4, 2022.

In July 2020, Mr. Clancy filed an administrative request for release with the BOP based on his asthma in combination with the COVID-19 pandemic. His request was denied by the Warden of FCI Allenwood on July 31, 2020. Mr. Clancy now moves this Court for a Reduction in Sentence under 18 U.S.C. § 3582(c)(1)(A)(i), stating that his prediabetes and asthma, in combination with the COVID-19 pandemic, constitute extraordinary and compelling reasons justifying his release. (ECF No. 109.)

The Court concludes that the Defendant's motion is properly before it, and that Mr. Clancy has established that his medical conditions are severe enough to constitute "extraordinary and compelling" circumstances that could warrant his release under the First Step Act. But the Court's

1

consideration of the factors set forth in 18 U.S.C. § 3553(a) yields the conclusion that release is not warranted because the Defendant's substantial criminal conviction history and the length of time left on his sentence weigh against his release. The Court therefore concludes that Mr. Clancy's sentence remains necessary to prevent danger to the community, to deter the commission of future crimes by the Defendant, and to promote respect for the law. Accordingly, the Defendant's Motion for Reduction in Sentence pursuant to § 3582(c)(1)(A)(i) at ECF No. 109 is DENIED without prejudice subject to its reassertion should circumstances warrant.

## I.    FACTUAL BACKGROUND

In January 2018, Mr. Clancy pled guilty to two counts of possession with intent to distribute heroin and fentanyl in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and to one count of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 925(c)(1)(A)(i). In October 2018, this Court sentenced Mr. Clancy to concurrent terms of imprisonment of thirty (30) months at each possession with intent to distribute count and a single consecutive sixty (60) months for the firearm possession count, to be followed by a six year term of supervised release. (ECF No. 59.) In January 2019, Mr. Clancy filed a § 2255 motion alleging ineffective assistance of trial counsel for failure to file a notice of appeal. (ECF No. 86.) An evidentiary hearing scheduled on that motion was indefinitely delayed because of the COVID pandemic. (ECF No. 113.)

On November 2, 2020, Mr. Clancy filed a Motion for Reduction in Sentence pursuant to the First Step Act. (ECF No. 109.) The Government filed a response opposing Mr. Clancy's motion on November 23, 2020 and submitted sealed medical records in support of its response on that same day. (ECF Nos. 115, 116.) Mr. Clancy filed a reply to that response on December 7, 2020. (ECF No. 117). On December 21, 2020, this Court ordered the Government to file a position

statement regarding whether the Court should accept into the record Mr. Clancy's submitted report from a non-treating physician evaluating his medical situation. (ECF No. 118.) The Government filed a Motion requesting the Production of Facts or Data underlying that expert opinion on January 14, 2021, to which the Defendant responded by opposing that Motion, explaining that the medical records already produced supported that expert opinion. (ECF Nos. 123, 134.) The Court granted the Government's Motion to Produce in part, requiring counsel for the defense to provide copies of any medical and BOP records relied on by the testifying physician, to the extent that they had not already been produced. (ECF No. 135.)

The Court held an evidentiary hearing and oral argument on February 2, 2021. On February 3, 2021, the U.S. Marshal advised the Court that Mr. Clancy had tested positive for COVID-19 at his then-place of custody, NEOCC. (ECF No. 137.) Accordingly, the Court authorized supplemental briefing on the subject of Mr. Clancy's COVID-19 diagnosis. *Id.* The Government filed a Motion requesting the production of additional medical records from the NEOCC and extending the briefing schedule until those records were produced, which Mr. Clancy opposed. (ECF Nos. 138, 139.) The Court granted the Government's motion. (ECF 141.) The Government filed a brief addressing Mr. Clancy's COVID-19 diagnosis and attaching his NEOCC medical records, to which Mr. Clancy responded. (ECF Nos. 142, 143, 144.) Finally, the United States Marshal confirmed to the Court on April 19, 2021 that Mr. Clancy had been moved from the NEOCC to the BCP, where he is currently incarcerated. The Court authorized Counsel to file supplemental briefs discussing conditions at BCP as they relate to Mr. Clancy's Motion, and the Government filed such a supplemental brief on April 26, 2021. (ECF No. 146.)

The Motion is now ripe for the Court's consideration.

## II.   LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007); *see also Dillon v. United States*, 560 U.S. 817, 819 (2010). One such specific authorization is the First Step Act's amendment of 18 U.S.C. § 3582. As amended, that provision allows a court to modify a defendant's term of imprisonment if "extraordinary and compelling reasons warrant such a reduction." § 3582(c)(1)(A)(i). In addition, the court must consider: (1) whether the defendant has exhausted the appropriate administrative remedies; (2) the factors set forth in 18 U.S.C. § 3553(a) to the extent that they are applicable; and (3) whether such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. § 3582(c)(1)(A).

## III.   DISCUSSION

After considering the relevant factors, the Court finds that Mr. Clancy's Motion is now properly before it, and the Court finds that Mr. Clancy has established that the combination of his asthma and prediabetes as conditions raising his risk of contracting severe illness from COVID-19 constitute circumstances rising to an "extraordinary and compelling" level. However, in considering the § 3553(a) factors, the Court concludes that a reduction of Mr. Clancy's sentence would be inconsistent with the purposes of sentencing in his case at this time, and as such, compassionate release is inappropriate at this time.

### A.  Exhaustion

Before  petitioning a court for relief under 18 U.S.C. § 3582(c), a defendant must first file an administrative request for compassionate release with the warden of their facility and then either: (1) fully exhaust BOP's administrative remedies; or (2) wait thirty (30) days from the date their administrative request was filed with the warden. § 3582(c)(1)(A). Here, the Government

4

concedes that exhaustion is met as to Mr. Clancy's arguments respecting his asthma in combination with COVID-19, but contests whether exhaustion is met as to Mr. Clancy's argument that his prediabetes increases his risk of contracting severe illness from COVID-19. Our Circuit requires "strict compliance" with § 3582(c)(1)(A)'s exhaustion requirement and has held that requirement to be mandatory. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see also United States v. Alam*, 960 F.3d 831, 933 (6th Cir. 2020) ("Even though [§ 3582(c)(1)(A)'s] exhaustion requirement does not implicate our subject matter jurisdiction, it remains a mandatory condition"). Therefore, the Court will independently confirm whether exhaustion is satisfied for Mr. Clancy's entire petition.

Although Mr. Clancy is currently temporarily housed at the BCP, which is not BOP-operated, he was previously confined at FCI Allenwood, a BOP facility. Mr. Clancy submitted his request for compassionate release to the Warden of FCI Allenwood in an email sent by his attorney to the Warden on July 14, 2020, at which time he was housed at the NEOCC but still designated to the Allenwood Low Security Correctional Institution. (ECF No. 109-7.) That email requested Mr. Clancy's release based on his asthma in combination with the COVID-19 pandemic. (ECF No. 109-7.) The Warden responded to Mr. Clancy's request in a July 31, 2020 letter to counsel that acknowledged receipt of the request and reported the BOP's conclusion that Mr. Clancy did not meet its criteria for compassionate release. (ECF No. 109-8.) In that letter, the Warden explained that "[h]ealth services staff [had] reviewed the medical records" to make that determination. (ECF No. 109-8.)

Although Mr. Clancy's petition to the Warden raised only his asthma, his current compassionate release petition now requests release based his increased susceptibility to a severe illness from COVID-19 due to both (1) his asthma and (2) his prediabetic condition. (ECF No.

109.) The Government argues that exhaustion is not met as to Mr. Clancy's prediabetes COVID-19 argument because Mr. Clancy did not raise that condition in his petition to the Warden. (ECF No. 113, at 2.)

This Court previously addressed the analysis of the exhaustion of medical claims not explicitly raised in a Defendant's administrative petition in *United States v. Davidson*, 2020 WL 4877255 (W.D. Pa. Aug. 20, 2020). There, a defendant's May 2019 administrative request for compassionate release cited his various medical conditions, but his April 2020 Motion for Reduction of Sentence Pursuant to 18 U.S.C. § 3582 also argued that those conditions would raise his risk of contracting severe illness from COVID-19. *Id.* at *3. The Court determined that because the Warden went beyond the "four corners" of the defendant's request and "conducted a thorough review" of his overall health status, and because the BOP announced an implementation of an extensive review of medical and custody situation of every BOP inmate in the context of the COVID-19 pandemic, the timing and status of Mr. Davidson's administrative request fundamentally differed from those cases where the BOP had denied administrative requests before the pandemic emerged. Instead, the Court declined to adopt the position that every change in a defendant's condition or the extent of COVID-19 at his facility necessarily requires a new request so that the BOP could assess the exact risk at that moment. *Id.* (citing *United States v. Tidwell*, —– F. Supp. 3d ——, 2020 WL 4504448 at *3 (E.D. Pa. Aug. 5, 2020)).

This case differs from *Davidson* because Mr. Clancy's prediabetes is a condition that pre-dated the submission of his administrative request, not a condition that subsequently arose. (ECF No. 109-2.) But the fundamental question in evaluating the claims raised in an administrative petition to the BOP is whether "all exhaustion-related goals have actually been accomplished." *Id.* at *13. Here, Mr. Clancy raised his asthma in the context of the COVID-19 pandemic to the

Warden. The Warden then himself reported that he went beyond the four corners of that complaint to conduct a "thorough review" of his medical records, which included reports that Mr. Clancy was prediabetic. (ECF No. 109-2.) And not only did the Warden report having made such a thorough review, the BOP has also advised the public that its case management staff have been "urgently" reviewing all inmates' conditions in light of the COVID-19 pandemic to determine whether they met home confinement criteria. *Frequently Asked Questions Regarding Inmate Home Confinement in Response to the COVID-19 Pandemic*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/faq.jsp. Therefore, the goal of exhaustion –to give the BOP the first opportunity to consider Mr. Clancy's health conditions–has been met. The Warden reasonably would have considered Mr. Clancy's prediabetes, given the Warden's thorough review of his BOP records for the particular purpose of determining whether his medical condition made him more susceptible to COVID-19.

Finally, this Court and others have determined that the COVID-19 pandemic may be considered in a §3582(c)(1)(A)(i) motion, even where it was not explicitly asserted in an initial petition, where the pandemic constitutes a circumstance that simply "amplified the risk to [a defendant's] health" posed by the health conditions that were asserted. *Davidson,* 2020 WL 4877255 at *12 (quoting *Tidwell*, 2020 WL 4504448, at *3); *see also Miller v. United States,* 453 F. Supp. 3d 1062, 1065 2 (E.D. Mich. Apr. 9, 2020) (finding exhaustion met where the defendant consistently sought compassionate release based on a "myriad of serious health conditions" which the pandemic "merely accentuated"). Similarly, Mr. Clancy's petition to the Warden requested his release not simply based on his asthma but based on his risk of contracting severe COVID-19 in light of his asthma. Mr. Clancy's risk of contracting severe COVID-19 is therefore the animating reason behind his petition to this Court, and his citation of prediabetes as a condition that may

compound his COVID-19 risk simply provides another example of a petitioner pointing to a factor that amplifies an already-asserted condition.

The Court therefore concludes that as of July 31, 2020, the BOP was aware of Mr. Clancy's request for compassionate release based on the health conditions raised here combined with the COVID-19 pandemic, and that much more than thirty (30) days have elapsed since then. The exhaustion requirement is met, and the Court will proceed accordingly.

### B.  <u>Extraordinary and Compelling Reasons</u>

Next, the Court must determine whether Mr. Clancy's medical conditions, combined with the ongoing COVID-19 pandemic, rise to an "extraordinary and compelling" level so that release might be warranted under § 3582(c)(1)(A)(i). Section 3582 does not define the phrase "extraordinary and compelling reasons." *Id.* Instead, Congress delegated that task to the Sentencing Commission. *See* 28 U.S.C. § 994(t) (stating that the Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"). The Sentencing Commission defined "extraordinary and compelling" as it related to the BOP's discretion under the pre-First Step Act version of § 3582(c)(1)(A)(i), but has not updated the applicable Policy Statement, found in the U.S. Sentencing Guidelines Manual ("the Guidelines") § 1B1.13, since the First Step Act became law. *See United States v. Rodriguez*, 451 F. Supp. 3d 392, 396 (E.D. Pa. Apr. 1, 2020).

A question that arises in this matter, and has arisen in other similar cases, is whether, and if so to what degree, the current provisions of the Guidelines and relevant Application Notes at U.S.S.G. § 1B1.13 promulgated by the Sentencing Commission in 2018 are applicable in consideration of this Motion. As a general matter, this Court has been of the view that those

provisions of the Guidelines are informative but not controlling and in any event advisory. *See, e.g.*, *United States v. Davidson*, No. 16-00139, 2020 WL 4877255, at \*17–18 (W.D. Pa. Aug. 20, 2020). Over the past few months, a number of the regional Courts of Appeal have considered this issue and have uniformly held that those Guideline provisions are not controlling in the consideration of compassionate release motions. *See United States v. Aruda*, No. 20-102452021, 2021 WL 1307884, at \*4 (9th Cir. Apr. 8, 2021); *United States v. Shkambi*, No. 20-40543, 2021 WL 1291609, at \*2–4  (5th Cir. Apr. 7, 2021); *United States v. McGee*, No. 20-5047, 2021 WL 1168980, at \*12 (10th Cir. Mar. 29, 2021); *United States v. McCoy*, 981 F.3d 271, 281–84 (4th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1109 (6th Cir. 2020); *United States v. Brooker*, 976 F.3d 228, 234–37 (2d Cir. 2020). And in this case and in others in this Court, it has been the position of the United States that § 1B1.13 is binding, notwithstanding that those provisions have not been considered or updated by the Sentencing Commission since Congress passed and the President signed into law the First Step Act. *See id.*

This issue is now before our Court of Appeals in a significantly different and perhaps more consequential permutation in *United States v. Andrews*, in which the key issue before that Court is whether a court's discretion to determine and define "extraordinary and compelling reasons" is constrained by U.S.S.G. § 1B.13 and its commentary, specifically in circumstances when such are asserted to exist due to a gross disparity between a sentence originally imposed and a sentence that would be imposed today for the same crime. 480 F. Supp. 3d 669 (E.D. Pa. 2020), *appeal docketed,* No. 20-2768 (3d Cir. Sep. 4, 2020).

This case involves a request for relief on the basis of the Defendant's current medical conditions. Although it appears that the central issue in *Andrews* is broader and perhaps of greater

reach than the central issue in this case, the involved statutory and Guidelines provisions suggest that a defendant's medical conditions is a topic central to the principles that have animated the concept of such release from its first appearance in the law. For our purposes, the only issue that need be addressed and resolved now is whether the referenced Guidelines provisions are controlling and set the scope of the factors that the Court may consider. To that extent, the Court joins the unanimously held view of the decisions noted above in concluding that the provisions of U.S.S.G. § 1B1.13 and its Application Notes are not controlling in deciding this issue. The provisions of U.S.S.G. § 1B1.13 and its Application Notes do not serve as a limitation on the factors or information that this Court may consider in deciding this specific Motion on the grounds presented in this case, but the Court will nonetheless consider them as part of its analysis in determining the issue now before the Court.

Relevant here, the Application Notes to § 1B1.13 of the Guidelines speak to conditions which would support compassionate release in the form of two different types of medical conditions that can rise to an "extraordinary and compelling" level: (1) terminal illnesses; and (2) non-terminal conditions that substantially diminish a defendant's ability to provide self-care within the correctional environment. *Id.* Mr. Clancy's initial compassionate release Motion appears to argue that his medical conditions of asthma and prediabetes qualify under the "non-terminal option" as conditions that substantially diminish his ability to provide self-care while incarcerated in the context of the COVID-19 crisis because they put Mr. Clancy at higher risk of contracting severe illness from COVID-19.

As a result of Mr. Clancy's recent diagnosis with and recovery from COVID-19, the Government now argues that Mr. Clancy's risk of contracting severe illness from COVID-19 has in essence passed, obviating the immediate threat that served as the basis of Mr. Clancy's motion

and refuting his claim under Section 3582's "extraordinary and compelling reasons" prong. (ECF No. 142.) Mr. Clancy responds by arguing that he remains at risk of experiencing severe illness from COVID-19, either because he may experience long-term symptoms from his recent infection or because he remains at risk of becoming reinfected with COVID-19.  (ECF No. 144.) The Court will first evaluate the effect of Mr. Clancy's recent diagnosis with COVID-19 on his compassionate release petition. Then, the Court will evaluate Mr. Clancy's asthma and prediabetes as medical conditions that may increase Mr. Clancy's risk of contracting severe illness from reinfection with COVID-19.

1.  Mr. Clancy's COVID-19 Diagnosis

The medical records produced by the NEOCC relating to Mr. Clancy's time at that facility show that Mr. Clancy took a COVID-19 test on January 30, 2021 that came back positive. (ECF No. 143, at 70.) The records next document Mr. Clancy's condition in a February 17, 2021 evaluation. *Id.* That evaluation reports that Mr. Clancy was subject to a 14-day quarantine after his positive test and was cleared from isolation on February 13, 2021. *Id*. A completed "pre-departure COVID-19 screening" form question included in the February 17th visit records asks whether the evaluated patient is experiencing any "fever/chills, new loss of smell/taste, new body aches, new cough or difficulty breathing, new sore throat or congestion, or new headache." (ECF No. 143, at 70.)  The form directs that if answer is "yes" to any of these questions or if the patient's temperature is over 100.4 degrees, that patient will not be cleared for transfer until a licensed independent practitioner evaluates and clears them as a "certifying health authority." *Id.* The box for "new nausea or diarrhea" is checked on Mr. Clancy's form. *Id.* But as the form requires, a registered nurse has signed off on the bottom of the form as a "certifying health authority" clearing Mr.

Clancy for travel. *Id*. The box next to that certification briefly gives the following note: "inmate quarantined for 14 days. Currently asymptomatic." *Id*.

The Government's supplemental briefing points to the evaluation form's indication that Mr. Clancy was "asymptomatic" and "show[ed] no medical complications" approximately 18 days after his initial positive test. (ECF No. 142, at 2) (citing ECF No. 143, at 70, 181.) The Government therefore argues that the immediate threat that served as the basis of Mr. Clancy's motion– contracting severe illness from COVID-19 – has "passed" and that his recovery refutes his claim under Section 3582's "extraordinary and compelling circumstances" prong. (ECF No. 142, at 2.)

In response, Mr. Clancy argues that despite the records' report that he was asymptomatic, he in fact did experience symptoms associated with COVID-19, including "shortness of breath, fatigue, and the loss of his sense of taste and smell." (ECF No. 144, at 1.) Mr. Clancy argues that the medical records do not contradict his reported symptoms, because he could have experienced symptoms before the date that he was evaluated as "asymptomatic" (which occurred only after his 14-day quarantine). (ECF No. 143, at 70.) And Mr. Clancy also argues that the records' conclusion that Mr. Clancy was "currently asymptomatic" is belied by the records' report that Mr. Clancy was experiencing "new nausea or diarrhea," symptoms common among people with COVID-19. *Id*.

First, the Court concludes that it is possible that Mr. Clancy's medical records could fairly be interpreted as consistent with his having had the symptoms he describes at some point. The only assessment the NEOCC provides of Mr. Clancy's symptoms comes from an examination that took place at least 17 days after the onset of his infection, and that exam asked no questions about symptoms before the examination date. But even assuming that Mr. Clancy did experience the symptoms he describes before his examination, the medical records do still show that Mr. Clancy's symptoms cleared up within his 14-day quarantine period. And the assessment form confirms that

Mr. Clancy's report of gastrointestinal distress triggered an individual screening by a nurse, who would have been required to determine he was not experiencing symptoms attributable to COVID-19 and was cleared to travel in order to authorize his release. (ECF No. 143, at 70.) Mr. Clancy also does not argue that he is currently ill, or that he has experienced any COVID-19 symptoms since that February 17th evaluation. (ECF No. 144.)

Regardless of whether Mr. Clancy experienced symptoms from his recent infection, he also argues that he may be at risk for experiencing severe symptoms from COVID-19 in the future – either from lasting effects of his current infection, or from a future reinfection. (ECF No. 144.) First, Mr. Clancy argues that he is at risk of experiencing long-run illness and symptoms as a result of his recent COVID-19 infection. (ECF No. 144, at 2.). Although his infection has not to date resulted in his hospitalization, Mr. Clancy argues that he could still experience long term, serious side effects from that infection, citing an article reporting on a small, non-peer reviewed study finding that more than 27% of people who were never hospitalized for COVID-19 still experienced significant post-COVID symptoms like shortness of breath, chest pain, cough, or abdominal pain. Pam Belluck, *Many 'Long Covid' Patients Had No Symptoms From Their Initial Infection*, NY Times (Mar. 8, 2021), available at https://nyti.ms/2OY2Gle (reporting that about a third of those patients suffering long-term side effects had had no symptoms from their initial COVID infection through the 10 days after they tested positive).

In short, although many unknowns still exist about long-run illness following COVID-19 infections–and although studies suggest it is *less* common for patients who are initially asymptomatic to develop long-term symptoms–it is certainly possible for a person in Mr. Clancy's situation to later develop side-effects related to a largely asymptomatic initial infection. But Mr. Clancy does not currently assert that he is experiencing any COVID-19 symptoms, even if he did

in the past or might in the future. (ECF No. 144.)  In any case, Mr. Clancy does not allege that he is currently ill with long-run side effects.

Finally, separate from his risk of suffering side effects from his recent infection, Mr. Clancy also asserts that he is still at risk for reinfection with COVID-19, and that his asthma and prediabetes continue to put him at higher risk of contracting a severe COVID-19 infection. (ECF No. 144, at 3.)[1] He proposes that this risk constitutes an extraordinary and compelling circumstance justifying his release. Scientific knowledge about reinfection risks is still developing: Mr. Clancy cites sources suggesting that newly discovered variants have heightened the risk of reinfection with COVID-19, and that infection with early variants of the COVID-19 virus may not protect against new variants. (ECF No. 144, at 3) (citing Advisory Board, *If you've already had Covid-19, can you contract a new variant? Here's what experts say* (Feb. 11, 2021) https://www.advisory.com/daily-briefing/2021/02/11/reinfection). The source that Mr. Clancy cites concludes that reinfections with the same initial variant are possible but rare; and that although information is inconclusive about risks posed by newer variants at the moment, newer variants most likely pose a higher reinfection risk. *Id.*

In sum, certain currently available scientific data suggests that although persons who have already been infected with COVID-19 are less vulnerable to reinfection with the same variant, they may still be vulnerable to reinfection with a different variant. Applied to Mr. Clancy, this would indicate that, having been infected once, he is at least somewhat less vulnerable to reinfection with the variant he already contracted, but that he remains vulnerable to other, different COVID-19

---

[1] The Government reports that the BCP has registered Mr. Clancy to receive the Pfizer COVID-19 vaccine. (ECF No. 146, at 2.) But because the Government does not report a timeline for when Mr. Clancy will begin the vaccination process, the Court is unable to estimate when Mr. Clancy can expect to be fully protected by the vaccine. The Court therefore will not consider Mr. Clancy's registration to receive the Pfizer vaccine as a factor diminishing his risk of reinfection.

variants. Because the record does not clearly show that Mr. Clancy's past COVID-19 infection has significantly reduced his overall risk of contracting COVID-19, the Court's reasoning below as to the risk of severe illness from reinfection with COVID-19 posed by Mr. Clancy's preexisting conditions of asthma and prediabetes is unchanged by his recent diagnosis with and recovery from COVID-19. As discussed below, the Court concludes that Mr. Clancy's has established that extraordinary and compelling circumstances exist by virtue of his moderate to severe asthma combined with his prediabetic condition.

2.  Mr. Clancy's Asthma and Prediabetes

First, Mr. Clancy asserts that his asthma puts him at heightened risk of severe illness if he were to again contract COVID-19. The CDC currently lists "moderate-to-severe" asthma as a condition that "can" put one at increased risk of contracting severe illness from COVID-19. *See People with Certain Medical Conditions*, Ctrs. For Disease Control & Prevention (last updated Apr. 29, 2020) https://bit.ly/2CrTAqa.  Mr. Clancy's BOP medical records show that he has a documented history of shortness of breath and asthma attacks that the BOP has treated with an albuterol inhaler prescription. (ECF No. 109-3.) Mr. Clancy's asthma has also previously been treated with prednisone, a systemic steroid. (ECF No. 109-3.) Mr. Clancy submitted both a letter and testimony from non-treating physician Dr. Amesh Adalja representing that Mr. Clancy's asthma diagnosis and past treatment with a steroid inhaler and systemic steroids put him at some increased risk of COVID-19 susceptibility and severity. (ECF No. 109-4, at 1.) That letter did not classify the severity of his asthma. *Id.*

The Government responds by arguing that Mr. Clancy's asthma is "mild," not "moderate or severe," and therefore does not fall into the CDC's category of conditions that can increase susceptibility to and severity of illness from COVID-19. (ECF No. 109-3, at 1.) The Government

specifically points to BOP medical records reporting that Mr. Clancy's albuterol inhaler is prescribed for use only "as needed" and that he "uses albuterol several times a week at most." (ECF No. 109-3, at 1.) The Government also cites Mr. Clancy's reports that he previously had a daily marijuana habit to argue that his asthma must of definition be mild, and further points to BOP record notations describing his asthma as "typically exercise-induced" and noting that he has had no hospitalizations since childhood. (ECF No. 109-3, at 1.)

The CDC itself does not provide asthma severity classifications, and thus for these purposes, the Court is put in a position of attempting to determine whether Mr. Clancy's asthma is "mild" or "moderate to severe" based on medical records that do not themselves make that determination. Indeed, the benchmarks for asthma severity classifications provided by the National Asthma Education and Prevention Program suggest that even an examining physician would require much more detailed information about symptom frequency and severity than Mr. Clancy's records provide. *See Asthma Care Quick Reference: Diagnosing and Managing Asthma*, National Heart, Lungs, and Blood Institute, https://bit.ly/3xQ9d2V, at 5 (separating "mild-persistent" asthma from "moderate persistent" or "severe persistent" asthma based the weekly frequency of asthma symptoms, degree that attacks interfere with a patient's daily activities, frequency of nighttime symptoms, frequency of inhaler use, and lung function test results). Dr. Adalja also testified to this effect, stating that asthma severity lies on a spectrum and would be difficult to classify exactly without a patient-kept, daily diary of symptoms.

The Court is in no position to in effect speculate about the categorical severity of Mr. Clancy's asthma based on the record before it. On the one hand, as the moving party, it would be up to Mr. Clancy to develop the necessary record by competent testimony or other evidence on this point, and Dr. Adalja was both thorough and candid as to the limits of his testimony, which

16

was not based on a personalized examination or evaluation of the specifics of Mr. Clancy's medical situation. The medical records submitted to the Court do not facially resolve the matter, nor does the Government's argument on this point. That said, to the extent that the Court can reasonably and fairly assess the severity of Mr. Clancy's condition based on his medical records, those records do indicate asthmatic symptoms that are more than "mild": Mr. Clancy uses an inhaler "several times a week," a markedly higher incidence of symptoms than the two days a week that the NAEPP states would signify a mild case. And he was previously treated with prednisone and a steroid inhaler, indicating that his normal inhaler was insufficient to manage his symptoms for at least a period of time. Based on the information that is in the record and the Court's assessment of it, the Court concludes that Mr. Clancy's asthma would fairly be considered "moderate".

The Court concludes that Mr. Clancy's "moderate" asthma is sufficient to establish extraordinary and compelling circumstances warranting his release. Although BOP doctors have prescribed Mr. Clancy an inhaler and monitored his condition, his asthma persists, requiring the use of his rescue inhaler several times a week. His condition therefore falls within the CDC's category of "moderate to severe" asthma, as a condition that can increase the risk of contracting severe illness from COVID-19.[2]

Mr. Clancy also asserts that his condition of being prediabetic raises his risk of contracting COVID-19. BOP medical records do note Mr. Clancy's diagnosis with prediabetes, which is

---

[2] The parties logically have cited to compassionate release cases from this and other courts that have considered such motions in the context of in essence comparing the medical conditions reported as impacting Mr. Clancy and those conditions noted in those other decisions. The Court has also reviewed those and similar cases in conjunction with the arguments advanced. But the nuances of Mr. Clancy's situation highlight that it would be an endeavor fraught with imprecision for litigants, or the Court, to in any given case canvass the field of the hundreds of compassionate release decisions rendered by the federal trial and appellate courts nationally in an effort to in effect "match" the medical situation then before this Court with those conditions that were before those other courts. The requirement for an individualized assessment of such matters on the specific record developed and presented is in the Court's judgment a necessary consequence of the structure of the compassionate release analysis.

defined as a "serious health condition where blood sugar levels are higher than normal, but not high enough yet to be diagnosed with type 2 diabetes." (ECF No. 109, at 6-7.). Although the CDC currently lists type 2 diabetes on its list of conditions that can increase one's risk of contracting severe illness from COVID-19, it does not mention prediabetes as a factor that can increase the risk of severe COVID-19. *See People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (last updated Apr. 29, 2021), https://bit.ly/2CrTAqa.

However, Mr. Clancy cites medical literature arguing that "prediabetes and type 2 diabetes share similar pathophysiology," including the key mechanisms underlying the severity of COVID-19 in type 2 diabetes patients. (ECF No. 109, at 7). Dr. Adalja similarly testified that prediabetes and diabetes lie on a spectrum and that a prediabetic patient experiences some immunosuppressant effect from an incipient prediabetic condition, albeit less than that associated with full-blown diabetes. The Court credits this argument and finds that it is at least plausible that Mr. Clancy has experienced some immunosuppressant effect from his prediabetes. And together with Mr. Clancy's asthma, a condition that does appears on the CDC list as a condition that can increase his risk of contracting severe illness from COVID-19, any immunosuppressant effect from Mr. Clancy's prediabetic condition will further increase that risk. The Court therefore concludes that Mr. Clancy has established that his asthma and his prediabetic condition are sufficiently severe in combination to make his risk of increased susceptibility to severe illness from COVID-19 higher than that of the average inmate. And although the BCP has implemented several protective measures to prevent the spread of COVID-19 in that facility (ECF No. 146), the Court finds that, given Mr. Clancy's medical conditions, these measures are insufficient to ameliorate his particular risk of contracting severe illness from COVID-19 to the degree that the risks outlined above have been mitigated in impact.

The Court therefore concludes that Mr. Clancy has established that his medical conditions put him at sufficient risk of contracting severe illness from COVID-19 so as to constitute extraordinary and compelling circumstances that could warrant his release.

**C.   The § 3553(a) Factors**

Although Mr. Clancy has established the existence of extraordinary and compelling circumstances based on his medical conditions, the Court nonetheless denies his Motion based on a consideration of the § 3553(a) factors. Even when a court determines that an extraordinary and compelling reason might warrant a defendant's release, the court must also consider whether release is appropriate in light of the factors set forth in § 3553(a). Specifically, "in considering the section 3553(a) factors, [the court] should assess whether those factors outweigh the 'extraordinary and compelling' reasons warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence." *United States v. Bess*, 455 F. Supp. 3d 53, 66 (W.D.N.Y. Apr. 22, 2020). The determination of whether to reduce an eligible defendant's term of incarceration for compassionate release after considering the § 3553(a) factors is committed to the discretion of the district court. *United States v. Jones*, No. 12-cr-38, 2020 WL 3871084, at *4 (W.D. Pa July 8, 2020) (citing *United States v. Pawlowski*, 967 F.3d 327 (3d Cir. June 26, 2020)). That discretion includes the district court's ability to consider the length of the defendant's original custodial sentence, including the portions served and remaining, when weighing the § 3553(a) factors. *Pawlowski*, 967 F.3d at 330–31.

Here, the Court concludes that several § 3553(a) factors weigh against Mr. Clancy's release currently, including (1) the nature and circumstances of the offense and the Defendant's history and characteristics; and (2) the need for the original sentence reflect the seriousness of the offense, to deter criminal conduct, and to protect the public from further crimes of the Defendant. First, the

Case 2:17-cr-00031-MRH   Document 147   Filed 05/07/21   Page 20 of 22


illegal drug distribution of which Mr. Clancy was convicted presents a "substantial risk of danger to the community," a danger that was heightened by Mr. Clancy's possession of a firearm in furtherance of the offense. (ECF No. 115, at 17-18.) And not only was Mr. Clancy convicted of possessing a firearm in furtherance of the offense at issue here, he also has multiple past convictions for illegal firearms possession in 2005, 2006, and 2009. (PSR ¶¶ 31, 34, 36.) Mr. Clancy has also failed to comply with Court-ordered conditions of release for federal convictions in the past. (PSR ¶ 36.) Specifically, Mr. Clancy was previously released to a halfway house, but returned to prison shortly thereafter due to his negative interactions with staff members and his failure to secure a job, in violation of his supervised release terms. (PSR ¶ 36.)[3]

Mr. Clancy argues that a reduced sentence would be consistent with the § 3553(a) factors because Mr. Clancy has some record of employment and rehabilitation and because a personal tragedy involving the loss of a very young child has made the circumstances of his incarceration unduly laborious and difficult. First, Mr. Clancy reports that he has volunteered as a youth sports coach in his community and describes his intermittent periods of employment as a line cook and at an automotive repair shop in between periods of incarceration. (ECF No. 59, at 8.) And Mr. Clancy also points to evidence of his efforts at rehabilitation while in prison, including his participation in a drug abuse education program, a parenting program, and multiple vocational courses. (ECF No. 109-9.) Although Mr. Clancy's participation in BOP programming provides positive indicators of rehabilitation, the Court would not conclude from that participation that his sentence is no longer necessary as originally imposed.

---

[3] Recently, BCP records show that on February 18, 2021, Mr. Clancy was issued a "misconduct" reprimand after Correctional Officers found smoking paper in his cell that tested positive for suspected synthetic marijuana. (ECF No. 146-1, at 10, 13.) While if such occurred it would be impermissible conduct on Mr. Clancy's part, the Court does not believe that it is conduct of sufficient certainty or consequence to carry weight in the analysis here, and the Court therefore will not consider it in its decisional process.

Finally, Mr. Clancy argues that the circumstances of his incarceration have been more severe than anticipated at sentencing because of the death of his youngest daughter. In February 2020, Mr. Clancy's 3-year-old daughter was tragically shot and killed by a family friend. (ECF No. 109-2.) Mr. Clancy reports that FCI-Allenwood did not allow him to attend his daughter's funeral and cites as hardships the fact that quarantines and isolation from visitors have separated Mr. Clancy from his support system. (ECF No. 109, at 23–24; ECF No. 109–10.) Mr. Clancy argues that these circumstances have made his incarceration "significantly more 'laborious and difficult,' weighing in favor of a shorter sentence." (ECF No. 109, at 25.) As a result of this tragedy, Mr. Clancy testified that he personally reached out to Mr. Richard Mark Carrington, Sr., the head of a local returning citizens program, to ask to be included in that program. Mr. Carrington testified at length about the program's components, including the importance of face-to-face, in-person meetings with precautionary measures including distancing and masks.

The Court recognizes and acknowledges that Mr. Clancy has suffered an immense loss. But Mr. Clancy moves for his release on medical grounds, arguing that extraordinary and compelling circumstances exist because his medical conditions increase his susceptibility to COVID-19,  so these matters, consequential as they are in Mr. Clancy's life, do not in the Court's estimation alter the Court's conclusions here.[4]

Finally, it is notable to the Court that Mr. Clancy's expected release date is not until December 2022, which is nearly nineteen months from now and constitutes a significant amount of Mr. Clancy's overall sentence. Considering Mr. Clancy's sentence completion, as well as his criminal record and prior failures to comply with supervised release conditions, the Court

---

[4] Mr. Carrington has testified that his reentry program and his full personal support would also be available to Mr. Clancy in the case that Mr. Clancy served his full term of incarceration as initially imposed. The Court is therefore optimistic that Mr. Clancy will have the support that he requires after serving his full term of incarceration.

concludes that the remainder of the ninety (90) month sentence remains necessary to adequately deter Mr. Clancy's criminal conduct and protect the public from any further crimes.

IV.   **CONCLUSION**

The Court has considered the relevant factors set forth in § 3582(c), as well as the applicable policy statements issued by the Sentencing Commission and the factors set forth in § 3553(a). Because the BOP has had more than thirty (30) days to consider Mr. Clancy's medical conditions, the Court concludes that Mr. Clancy has exhausted his BOP administrative obligations, and that his Motion is properly before it. The Court also concludes that Mr. Clancy has established that his moderate to severe asthma and prediabetic condition so raise his risk of contracting severe illness from COVID-19 as to rise to an "extraordinary and compelling" level that could support his release. But although Mr. Clancy has demonstrated extraordinary and compelling conditions, the record before the Court counsels the conclusion under the § 3553(a) factors that he remains a risk to the community such that compassionate release is not appropriate at this time. Accordingly, the Defendant's Motion for Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) at ECF No. 109 is DENIED without prejudice subject to its reassertion should circumstances warrant.

An appropriate Order will issue.

  s/  Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated: May 7, 2021

cc:      All counsel of record